| | |
|---|---|
| 1<br>2<br>3<br>4<br>5<br>6<br>7<br>8 | SHEPPARD, MULLIN, RICHTER & HAMPTON LLP<br>  A Limited Liability Partnership<br>  Including Professional Corporations<br>SHANNON Z. PETERSEN, Cal. Bar No. 211426<br>JOSEPH C. PEACOCK, Cal. Bar No. 317317<br>DANIEL J. BIRMINGHAM, Cal. Bar No. 357351<br>12275 El Camino Real, Suite 100<br>San Diego, California 92130<br>Telephone:  858.720.8900<br>Email:       spetersen@sheppardmullin.com<br>            jpeacock@sheppardmullin.com<br>            dbirmingham@sheppardmullin.com<br><br>Attorneys for Plaintiff<br>BANK OF HOPE |

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BANK OF HOPE, a California corporation,<br><br>        Plaintiff,<br><br>    v.<br><br>HANMI BANK, a California corporation,<br><br>        Defendant. | Case No. 2:26-cv-1187<br><br>**COMPLAINT FOR:**<br><br>**1. MISAPPROPRIATION OF TRADE SECRETS (Cal. Civ. Code § 3426 *et. seq.*)**<br><br>**2. MISAPPROPRIATION OF TRADE SECRETS (18 U.S.C. § 1836 *et seq.*)**<br><br>**DEMAND FOR JURY TRIAL** |

SMRH:4916-2099-1087.5

-1-

Plaintiff Bank of Hope ("HOPE") files this complaint against Defendant Hanmi Bank ("Hanmi") and alleges as follows:

## INTRODUCTION

1.  This action arises from Hanmi Bank's unlawful solicitation of HOPE's clients through the knowing misappropriation and use of HOPE's confidential and proprietary trade secret information.

2.  Former HOPE employee Sean Doe ("Doe") misappropriated highly detailed and confidential financial information concerning HOPE's clients before commencing employment at HOPE's direct competitor: Hanmi Bank.

3.  While employed at Hanmi, Doe used this valuable information to unfairly compete against HOPE, target HOPE's clients, and secure business for the benefit Hanmi.  Doe acted within the course and scope of his employment at Hanmi in misappropriating HOPE's trade secrets on behalf of Hanmi and as the agent of Hanmi.  Thus, Hanmi is liable for the actions of Doe in misappropriating HOPE's trade secrets.

4.  Through discovery in HOPE's ongoing arbitration with Doe, evidence has revealed that Hanmi's top executives supported and approved Doe's endeavor to unfairly compete against HOPE through the misappropriation of its trade secret information.  Since Doe resigned from HOPE, he and Hanmi have engaged in a concerted effort to unlawfully solicit and acquire HOPE's clients and prospective client accounts using HOPE's trade secrets.

5.  Because Hanmi refused to voluntarily join HOPE's arbitration against Doe, HOPE brings this lawsuit to protect its trade secrets and to recover damages resulting from the loss of confidential information critical to HOPE's business.

## THE PARTIES

6.  HOPE is a full-service California state-chartered bank with its principal place of business in Los Angeles, California.

7. Hanmi is a full-service California state-chartered bank with its principal place of business in Los Angeles, California.

## JURISDICTION AND VENUE

8. Jurisdiction is proper in this district pursuant to 28 U.S.C. §§ 1331 and 1367 because HOPE asserts claims under the federal Defend Trade Secrets Act, codified at 18 U.S.C. § 1836 *et seq.*

9. Venue is proper in this district under 28 U.S.C. §§ 1391(b)(1) and (b)(2) because Hanmi's principal place of business is in this district and a substantial part of the events or omissions giving rise to HOPE's claims occurred in this district.

## FACTUAL ALLEGATIONS

**A.    Sean Doe's Employment with and Duties to HOPE**

10. HOPE employed Doe as a Senior Vice President, Relationship Manager Group Director and assigned Doe to HOPE's Duluth, Georgia office. Doe's primary duties included maintaining existing loan and deposit relationships with HOPE's clients and growing HOPE's loan and deposit relationships.

11. Doe engaged in and oversaw the underwriting of loans for HOPE's clients.

12. Doe also prepared sensitive and confidential internal HOPE credit memoranda analyzing client creditworthiness, loan terms, loan types, interest rates, maturity dates, collateral, as well as a wide variety of other sophisticated, proprietary information including, without limitation, non-public financial data, analyses, and metrics concerning clients' banking relationships.

13. While employed at HOPE, Doe maintained an Excel spreadsheet to track various client accounts. Doe used this Excel spreadsheet in conjunction with both underwriting and weekly reports. This Excel spreadsheet contained detailed financial information concerning HOPE's clients. Doe continually updated this Excel spreadsheet throughout his employment at HOPE.

14. In the course of working for HOPE, Doe executed a series of agreements, including HOPE's Non-Disclosure Agreement.

15. Doe agreed to be bound by certain restrictions and obligations during the terms of his employment relationship with HOPE, and thereafter, including protecting HOPE's confidential and proprietary information from disclosure to third-parties as well as prohibitions against improper use and disclosure of HOPE's trade secrets.

16. Doe was also bound by the terms of HOPE's Employee Handbook throughout his employment with HOPE. HOPE's Employee Handbook includes, without limitation, "Handling Confidential Information" and "Non-Disclosure" policies.

17. Doe knew and understood that he handled numerous types of confidential information at HOPE.

18. While employed at HOPE, Doe mostly worked with HOPE clients engaged in the automotive industry in the southeastern region of the United States.

**B.   Hanmi Hires Sean Doe**

19. Upon information and belief, Hanmi was aware of opportunities concerning potential clients in the automotive industry in the southeastern region of the United States.

20. Upon information and belief, Hanmi sought to recruit bankers and relationship managers to grow its business — including in the southeastern region of the United States.

21. In June 2023, Chris Cho, Hanmi's Executive Vice President Regional Chief Banking Officer, began communicating with Doe about potential employment at Hanmi.

22. Before hiring Sean Doe, Chris Cho asked Doe to disclose the volume of loans and deposits that he generates on a yearly basis. Chris Cho also inquired

about which HOPE clients substantiated Doe's representations concerning the volume of loans and deposits that he could generate on a yearly basis.

23. On July 13, 2023, Doe resigned from his position at HOPE.

24. On July 14, 2023, HOPE conducted Doe's exit interview. During the exit interview, Doe refused to sign an acknowledgment that he had returned all HOPE property and information. Doe also refused to sign an acknowledgment of his ongoing duty to protect and not disclose or use HOPE's confidential customer information.

25. On July 14, 2023, Hanmi sent Doe an offer letter for a job as a Senior Vice President, Banking Manager. Per the offer letter, Doe would work directly underneath Chris Cho, and would be eligible for incentive pay and bonuses based on his and Hanmi's performance.

26. Hanmi's Chief Banking Officer, Anthony Kim, approved of hiring Sean Doe upon Chris Cho's recommendation.

27. Doe's job responsibilities at Hanmi included the origination and management of loans for clients in the southeastern region of the United States.

28. In the days following his resignation, Sean Doe began soliciting HOPE's clients using HOPE's confidential information.

29. Doe commenced employment at Hanmi on July 24, 2023.

**C.    Hanmi Acquires HOPE's Trade Secrets Through Improper Means**

30. On July 25, 2023, Doe emailed a draft PowerPoint Presentation — from his personal email address — to Chris Cho. The PowerPoint Presentation detailed Sean Doe's strategy of targeting large Korean subsidiaries in the southeast over a pre-meditated period of time at strategic dates.

31. On July 26, 2023, Doe emailed an updated PowerPoint Presentation — again from his personal email address — to Chris Cho. Doe added a slide detailing his target customers and timelines. The target customers and timelines slide consists

almost exclusively of then-current HOPE clients, discloses confidential HOPE client information, and discloses multiple HOPE trade secrets.

32. Doe utilized HOPE's trade secrets and confidential client information to draft and create the PowerPoint's detailed financial numbers and target dates—including HOPE client names, deposit amounts, types of deposit accounts, loan amounts, loan types, and maturity dates.

33. Much of the financial information in the PowerPoint matches financial data contained in HOPE's confidential client credit memoranda. The detailed financial information contained in the PowerPoint Presentation is not publicly available.

34. Doe created the PowerPoint Presentation to explain opportunities in the southeastern region of the United States to Hanmi executives—these opportunities consisted of getting current HOPE clients to refinance their loans with Hanmi.

35. On July 27, 2023, Doe presented the PowerPoint in Los Angeles to Hanmi's Chief Executive Officer, Bonnie Lee, Hanmi's Chief Banking Officer, Anthony Kim, and Chris Cho.

36. Hanmi's CEO, Bonnie Lee, thoroughly engaged in the presentation and asked questions to Doe about his business strategy and the opportunities in the southeast, specifically targeting clients of HOPE.

37. Due to the level of detail concerning HOPE's clients' non-public financial information in the PowerPoint Presentation — along with Doe's recent resignation from HOPE — Chris Cho, Bonnie Lee, and Anthony Kim knew or had reason to know that HOPE's trade secrets had been improperly acquired. These HOPE clients were not Hanmi clients at the time, and it was only Doe's third day on the job at Hanmi. But for Doe's misappropriation of HOPE's trade secrets, Hanmi would not have had any of this confidential HOPE client information. Further, Hanmi considers such information confidential and non-public when it concerns their own clients.

38. Upon information and belief, Hanmi derived HOPE's trade secrets from Sean Doe.

39. Upon information and belief, Hanmi's CEO Bonnie Lee also discussed HOPE's trade secrets and HOPE's clients at a lunch meeting with Doe and Chris Cho on July 27, 2023.

40. Upon information and belief, Hanmi's CEO Bonnie Lee and CBO Anthony Kim approved Sean Doe's business plan and strategy — *i.e.*, misappropriating HOPE's trade secrets to solicit HOPE's clients in the southeast and attract them to Hanmi — and authorized Sean Doe to proceed.

**D.    Hanmi Utilizes HOPE's Trade Secrets to Solicit and Acquire HOPE's Clients In a Multi-Year Scheme**

41. With the support of Hanmi, Doe began methodically soliciting HOPE's clients in accordance with the strategy outlined in the PowerPoint Presentation.

42. Upon information and belief, Hanmi's executives knew of, approved, and authorized the implementation of Doe's misappropriation scheme.

43. Throughout his ongoing solicitations of HOPE's clients, Doe periodically conferred with Chris Cho on loan terms that Hanmi could offer to compete with HOPE.

44. Utilizing HOPE's trade secret information, Doe created a spreadsheet (the "Spreadsheet"). The Spreadsheet contained detailed and precise financial information about HOPE's clients. The Spreadsheet details each HOPE client's confidential financial information, contact information, loan maturity dates, and strategic target dates.

45. By no later than August 11, 2023, Doe saved the Spreadsheet on his Hanmi computer.

46. As of August 11, 2023, every single company listed on Doe's Spreadsheet was an active client of HOPE.

47. The companies and HOPE clients listed on the Spreadsheet were not Hanmi clients at the time of its creation, and Hanmi could not have known the detailed financial information therein but for through the use and misappropriation of HOPE's trade secrets.

48. Together, the PowerPoint Presentation and Spreadsheet provided a detailed plan of attack for Hanmi, through its employee Doe, to target and solicit HOPE clients using HOPE's trade secrets to solicit, undercut, and unfairly compete with HOPE.

49. While employed by Hanmi Bank, Doe solicited some of HOPE's most valuable and well-established clients using HOPE's trade secret information. With access to this proprietary information, Doe approached HOPE's clients with detailed knowledge of sensitive issues previously negotiated between HOPE and its borrowers, including loan terms, interest rates, and other confidential terms. Doe further misused HOPE's trade secret information to solicit these clients for Hanmi Bank's benefit. He was also aware, through HOPE's records, of when client loans would mature and timed his solicitations to coincide with maturity dates, offering loan terms that undercut HOPE's offerings.

50. At all relevant times, Sean Doe acted within the scope of his employment at Hanmi by soliciting and ultimately acquiring HOPE's clients. Specifically, Sean Doe prepared multiple Hanmi credit memoranda for HOPE clients, participated in the underwriting and origination of loans for former HOPE clients at Hanmi, and communicated repeatedly and often with executives at HOPE clients to develop business for Hanmi.

51. Hanmi has rewarded Doe with incentive pay and bonus pay throughout his employment at Hanmi. Hanmi has also benefited financially from Doe's misappropriation of HOPE's trade secrets acting within the scope of his employment at Hanmi.

52. Upon information and belief, Hanmi knew or should have known that Doe utilized HOPE's trade secrets to solicit potential clients, and actively participated in and authorized Doe's scheme.

53. Upon information and belief, Hanmi's executives utilized HOPE's trade secrets to approve the competitive loan terms that Doe offered to HOPE's clients and to undercut HOPE's offerings by slim margins.

54. Hanmi successfully secured multiple HOPE client accounts between 2023 and 2025 through the improper acquisition and use of HOPE's trade secrets.

55. Hanmi continues to service these former HOPE client accounts and has caused HOPE substantial and ongoing financial and reputational harm.

## FIRST CAUSE OF ACTION

**(Misappropriation of Trade Secrets, Cal. Civ. Code § 3426 *et seq.*)**

56. HOPE realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

57. HOPE is the owner of certain confidential client information (including identities, contact information, loan preferences, including preferred interest rates and other terms, and other information developed through investment of significant time and expense) and other trade secret information which HOPE stores in electronic and physical form.

58. These materials are not generally known or readily accessible to the public or to HOPE's competitors.

59. These materials are trade secrets and HOPE took reasonable measures to keep these materials secret, including without limitation, restricting access to this information, requiring employees with access to that information to use it only within the scope and course of employment, and requiring employees to enter into confidentiality agreements not to disclose the information for any other purpose.

60. The trade secret information misappropriated by Hanmi has independent economic value by virtue of being a secret because, among other

things, it contains confidential HOPE client information, including contact information, client preferences and borrower specifications, and other client information, all created or obtained through significant time, resources, and/or expense by HOPE, and on which HOPE's business depends. The disclosure or use of this information by those outside HOPE causes irreparable harm to HOPE because it allows HOPE's competitors, such as Hanmi, to solicit HOPE's clients with the knowledge of the target-client's financial status, credit history, borrower specifications and preferences, account information, payment history, and other sensitive information, without having to invest the significant time and resources necessary to create and/or obtain this information. This theft of HOPE's trade secret material allows Hanmi to efficiently contact HOPE's clients at the most opportune times, to solicit them by undercutting HOPE's offerings with full knowledge of HOPE's specific offerings for each client, and to process their loan applications using the HOPE data.

61. Through Doe, Hanmi improperly acquired, retained, and misused this trade secret material for its personal benefit and authorized Doe to solicit HOPE's clients and acquire business for Hanmi Bank using HOPE's trade secret information.

62. Doe acted within the scope of his employment at Hanmi in misappropriating HOPE's trade secrets to generate loans and deposits at Hanmi Bank.

63. As a direct and proximate cause of Hanmi's wrongful conduct, HOPE has suffered and will continue to suffer financial loss, imminent and irreparable harm, loss of the confidentiality of its trade secrets, loss of good will, loss of business opportunities, and other continuing harm, in an amount to be proven at trial.

64. The losses and harm to HOPE are ongoing and cannot be remedied by damages alone. HOPE has no adequate remedy at law for sufficient compensation for the wrongs committed by Hanmi. Accordingly, in addition to damages, HOPE is

entitled to injunctive relief enjoining Hanmi from continuing to wrongfully use HOPE's confidential, proprietary, and trade secret information.

65. As a further direct and proximate result of Hanmi's wrongful conduct, Hanmi Bank has been unjustly enriched in an amount to be proven at trial.

66. The above actions of Hanmi were willful and malicious and justify an award of exemplary damages and attorneys' fees.

## SECOND CAUSE OF ACTION

**(Misappropriation of Trade Secrets, 18 U.S.C. § 1836 *et seq.*)**

67. HOPE realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

68. The Defend Trade Secrets Act ("DTSA") of 2016, Pub. L. No. 114-153, 130 Stat. 376, which was passed into law on May 11, 2016 and amends chapter 90 of Title 18 of the United States Code, forbids threatened and actual misappropriation of trade secrets if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce.

69. Under the DTSA, "trade secret" means all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if, (a) the owner thereof has taken reasonable measures to keep such information secret, and (b) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

70. Under the DTSA, "misappropriation" means: (a) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret

was acquired by improper means; or (b) disclosure or use of a trade secret of another without express or implied consent by a person who (i) used improper means to acquire knowledge of the trade secret, or (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was derived from or through a person who had used improper means to acquire the trade secret, acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret, or derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret, or (iii) before a material change of the position of the person, knew or had reason to know that the trade secret was a trade secret and knowledge of the trade secret had been acquired by accident or mistake.

71.  Under the DTSA, "improper means" includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means.

72.  HOPE dedicated and continues to dedicate substantial time and resources toward developing its trade secrets, as detailed above.

73.  The trade secrets Hanmi misappropriated include but are not limited to highly sensitive and detailed non-public financial information concerning HOPE's clients developed by HOPE over time at significant cost and effort to underwrite, manage, and extend loans, as well as attract and manage deposits.

74.  These trade secrets are not generally known to the public and have independent economic value to HOPE by allowing HOPE to structure unique financial offerings to each of its clients. These trade secrets would be highly valuable to a competitor, such as Hanmi, by providing them with a blueprint to replicate and undercut HOPE's loan offerings for its clients and prospective clients. Further, these trade secrets would permit a competitor, such as Hanmi, to anticipate HOPE's future conduct and beat it to market with similar offerings, and to solicit

and then negotiate better terms with those HOPE clients and prospective clients as their loan maturity dates at HOPE approached.

75. At all relevant times, HOPE has made reasonable efforts to ensure its trade secrets remain confidential, proprietary, secret, and available for HOPE's commercial use only. Among other measures, HOPE limits access to its trade secrets, prevents files from being downloaded onto thumb drives, and monitors email traffic to external email addresses.

76. Doe misappropriated this confidential and proprietary information from HOPE and improperly disclosed it to Hanmi.

77. Hanmi knew or should have known that the information Doe disclosed in the PowerPoint Presentation on July 27, 2023 constituted HOPE's trade secrets because Hanmi Bank is engaged in the same industry and considers such information confidential for its own clients.

78. Hanmi authorized Doe's scheme to misappropriate HOPE's trade secrets and attract HOPE clients over a strategically planned and pre-meditated period of time that aligned with HOPE's clients' loan maturity dates.

79. In any event, Doe acted within the scope of his employment at Hanmi in misappropriating HOPE's trade secrets to generate loans and deposits at Hanmi Bank.

80. HOPE has no adequate remedy at law for such present and future harm, and therefore, is entitled to injunctive relief in addition to compensatory relief.

81. Hanmi's actions will continue to cause irreparable harm to HOPE if not enjoined.

82. Additionally, because Hanmi has committed the acts alleged herein willfully, in bad faith, from an improper motive amounting to malice, and in conscious disregard of HOPE's rights, HOPE is entitled to recover punitive damages from Hanmi, in an amount according to proof at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

1. Preliminary and permanent injunctive relief;

2. Declaratory relief;

3. Compensatory damages from actual loss, unjust enrichment, or payment of a reasonable royalty for Hanmi's unauthorized disclosure or use of the trade secrets, pursuant to Cal. Civ. Code § 3426.3(b) and/or 18 U.S.C. § 1836(b)(3)(B)(ii);

4. Punitive and exemplary damages in an amount to be proven at trial;

5. All costs of suit, including attorneys' fees to the extent allowed by law and as authorized by statutes;

6. Pre-judgment and post-judgment interest at the applicable legal rate; and

7. All other relief as this Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff Bank of Hope hereby demands a trial by jury on all issues triable.

Dated: February 5, 2026

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By: */s/ Shannon Z. Petersen*
SHANNON Z. PETERSEN
JOSEPH C. PEACOCK
DANIEL J. BIRMINGHAM

Attorneys for Plaintiff
BANK OF HOPE

SMRH:4916-2099-1087.5

-14-